## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JAIME LYNN HOLMES,** | : | **NO.: 1:10-CV-00070** |
| **Plaintiff** | : | |
| | : | **JUDGE CONNER** |
| **v.** | : | |
| | : | **MAGISTRATE JUDGE METHVIN** |
| **METROPOLITAN LIFE** | : | |
| **INSURANCE COMPANY,** | : | |
| **Defendant** | : | |
| | : | |

## REPORT AND RECOMMENDATION ON THE PARTIES'
## CROSS MOTIONS FOR SUMMARY JUDGMENT
### (Docs. 26, 29)

In this insurance-coverage dispute, plaintiff Jaime Lynn Holmes seeks reversal of the decision by defendant Metropolitan Life Insurance Company (MetLife) denying Holmes's claim for long-term disability (LTD) benefits under a plan governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461. Both parties have filed motions for summary judgment.[1] The motions have been referred to the undersigned magistrate judge for a report and recommendation.[2]

### Issues Presented

The parties' cross motions for summary judgment raise the following issues:

1.  MetLife argues that under the applicable arbitrary-and-capricious standard of review for eligibility decisions, there is no basis for overturning its denial of coverage to plaintiff because its decision was reasonable and supported by substantial evidence.

---

[1] Docs. 26, 29.

[2] (Doc. 35.)

2

2.      MetLife argues in the alternative that even if its denial of benefits was
        arbitrary and capricious, Holmes' LTD benefits would be limited to a
        twenty-four-month period by the terms of the benefits plan.

3.      Holmes argues that defendant abused its discretion by ignoring plaintiff's
        credible evidence of disability and improperly relying on the opinions of
        "consultants" or "independent reviewing physicians."

## FINDINGS AND CONCLUSIONS

### I. Procedural History

Plaintiff's complaint was filed on January 12, 2010 (Doc. 1). MetLife moved for summary judgment on March 17, 2011, and the same day filed a supporting brief and a statement of material facts (Docs. 26-28). MetLife also submitted the complete administrative record upon which it based its eligibility decisions (Docs. 27-2 to 27-14). On that same day, plaintiff filed her own motion for summary judgment and supporting brief (Docs. 29, 30). Plaintiff's motion is styled as a statement of facts, to which defendant filed a response (Doc. 33). Defendant also filed a brief in opposition to plaintiff's motion (Doc. 34), but plaintiff filed neither a response to defendant's statement of facts, nor a brief in opposition to defendant's motion.

### II. Factual Background

Holmes was previously an employee of the Penn State Milton S. Hershey Medical Center, first as an emergency medical technician (EMT) and later as a registration

3

associate.[3] While employed there, she was a participant in the Milton S. Hershey Medical

Center Cafeteria and Welfare Benefit Plan.[4] This benefit plan is subject to ERISA.[5]

MetLife issued this plan to Hershey Medical Center and served as the claims

administrator.[6] The plan provides that "the Plan administrator and other Plan fiduciaries

shall have discretionary authority to interpret the terms of the Plan and to determine

eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan."[7]

The benefit plan defines "disabled" or "disability" as follows:

- You are receiving Appropriate Care and Treatment and complying with
  the requirements of such treatment; and
- You are unable to earn:
  - during the Elimination period and the next 24 months of Sickness or
    accidental injury, more than 80% of Your Predisability Earnings at
    Your Own Occupation from any employer in Your Local Economy
    . . . .[8]

The plan also contains limitations on the period of time over which benefits will be paid:

---

[3] Pl.'s Mot. for Summ. J. ¶ 1, Doc. 29.

[4] Def.'s Stmt. of Undisputed Facts ¶ 2, Doc. 28.

[5] *Id.* ¶ 1.

[6] *Id.* ¶ 4.

[7] Penn State Milton S. Hershey Medical Center Benefit Plan, Policy No. 116536-1-G
(Jan. 1, 2005) [hereinafter Benefit Plan], Doc. 27-2, at 5, 7; Doc. 27-2, at 13; *see also*
Suter Aff. ¶¶ 1–2, March 14, 2011, Doc. 27-2, at 3–4 (certifying the administrative
record, including the benefit plan, as accurately reproduced).

[8] Benefit Plan at 20, Doc. 27-2, at 26.

4

If you are Disabled due to:

. . . .

- Neuromuscular, musculoskeletal or soft tissue disorder including, but
  not limited to, any disease or disorder of the spine or extremities and
  their surrounding soft tissue; including sprains and strains of joints and
  adjacent muscles, unless the Disability has objective evidence of:
    - Seropositive arthritis;
    - Spinal Tumors, malignancy, or Vascular Malformations;
    - Radiculopathies;
    - Myelopathies;
    - Traumatic Spinal Cord Necrosis; or
    - Myopathies . . .

. . . .

We will limit Your Disability benefits to a combined lifetime maximum for
any and all of the above equal to the lesser of:
- 24 months; or
- the Maximum Benefit Period.[9]

While performing her duties as an EMT, Holmes sustained a back injury on May 30,

2003, which she states rendered her unable to continue working in that capacity.[10] In

connection with her injury, Holmes underwent two surgeries and a host of other

procedures to address her chronic pain, including: a posterior fusion at L5-S1; anterior

---

[9] *Id.* at 42, Doc. 27-2, at 48.

[10] Pl.'s Mot. for Summ. J. ¶ 4, Doc. 29. *See also* Doc. 27-3, at Bates No. 62 (indicating in
MetLife's Claim Activity Log that Holmes had reported suffering an injury in 2003 while
working as an EMT). *But see* Def.'s Response to Pl.'s Mot. for Summ. J. ¶ 4, Doc. 33
(denying that Holmes's May 2003 injury kept her from being able to work as an EMT).

5

fusion at L5-S1; medial branch block; facet block; facet rhizotomy; osteopathic

manipulation; epidural steroid injections; pain medication; and physical therapy.[11] Among

her diagnoses are somatic dysfunction; possible future lumbar fusion at L4-5 secondary to

right herniated disc; a longer right leg than left leg; chronic back pain; and failed back

syndrome.[12] She may yet require further surgery.[13]

In 2004, following her return to work, Holmes was transferred to a sedentary job at

Hershey Medical Center, working as a Registration Associate.[14] She stopped working on

October 15, 2007.[15] Just over a year later, on October 29, 2008, Holmes submitted a claim

for long-term benefits to MetLife.[16] She reported being unable to work any longer

because back pain from her 2003 injury had progressively worsened.[17]

In support of her claim, Holmes submitted medical documentation from October 2007

to October 2008, including the medical records of her treating physicians, Drs. William J.

---

[11] Pl.'s Mot. for Summ. J. ¶ 5, Doc. 29.

[12] *Id.* ¶ 6; Andrew J. Wren, Outpatient Note 1 (June 11, 2009), Doc. 30-1, at 39.

[13] Andrew J. Wren, Outpatient Note 1 (June 11, 2009), Doc. 30-1, at 39.

[14] Def.'s Stmt. of Undisputed Facts ¶¶ 12, 15, Doc. 28.

[15] *Id.* at ¶ 13.

[16] *Id.*

[17] *Id.* at ¶ 14. *See also infra* nn.64–82 and accompanying text.

6

Curry, Joseph P. Krzeminski, and Andrew J. Wren.[18] Dr. Curry reported on October 14,

2008, that Holmes could intermittently sit, stand, and walk for one-hour periods.[19] Three

days later, on October 17, Holmes told Dr. Curry that her job "involves a fair amount of

sitting," which she could only tolerate for a four-hour period.[20] The plan that Dr. Curry

developed that day called for Holmes to work four-hour shifts the following week, during

which she would alternate between sitting and standing, remaining in either position for

no more than twenty minutes at a time.[21]

At MetLife's request, Hershey Medical Center filled out a form describing the

physical requirements of Holmes's job. According to this form, completed on October 15,

2008, Holmes's Registration Associate position required 7–8 hours of sitting, 1–2 hours

of walking, repetitive use of both hands, frequent interpersonal relationships, and

continual stressful situations.[22] On November 20, 2008, MetLife spoke with Holmes's

former supervisor, Heather Moore, who provided further details about Holmes's job.

---

[18] *Id.* at ¶ 16.

[19] *Id.* ¶ 17; William J. Curry, M.D., Attending Physician Statement (Oct. 14, 2008), Doc. 27-13, at 14–16.

[20] Def.'s Stmt. of Undisputed Facts ¶ 18, Doc. 28; William J. Curry, M.D., Final Outpatient Report (Oct. 17, 2008), Doc. 27-13, at 35, 37.

[21] Def.'s Stmt. of Undisputed Facts ¶ 19, Doc. 28; William J. Curry, M.D., Final Outpatient Report (Oct. 17, 2008), Doc. 27-13, at 35.

[22] Def.'s Stmt. of Undisputed Facts ¶ 20, Doc. 28; Doc. 27-12, at 21.

7

Moore said that Holmes's job did not require 7–8 hours of constant sitting.[23] Rather, Holmes would sit with each patient for the 15–20 minutes it took to register them, but her job required her "to get up and walk to the printer and other patient areas to get patients and escort them to [her] work station."[24] Her job "allow[ed]" for sitting, standing, and walking throughout the work day.[25]

MetLife forwarded Holmes's file to Dr. Charles A. Lancelotta, a neurosurgeon, for an independent review.[26] After reviewing Holmes's medical records and speaking with Dr. Krzeminski, Dr. Lancelotta issued a report on December 26, 2008.[27] He concluded that Holmes's medical information indicated no functional limitations on her ability to work full-time.[28] Responding to a question about Holmes's prognosis for returning to work, Dr. Lancelotta stated: "I cannot answer this question. . . . [Holmes] has no neurologic

---

[23] Def.'s Stmt. of Undisputed Facts ¶ 21, Doc. 28; Doc. 27-3, at Bates No. 74.

[24] *Ids.*

[25] *Ids.*

[26] Def.'s Stmt. of Undisputed Facts ¶ 22, Doc. 28.

[27] *Id.* ¶ 23; Letter from Charles J. Lancelotta, M.D., Med. Consultants Network, Inc., to Michele McCann, Adjuster, Metropolitan Life Ins. Co. (Dec. 26, 2008), Doc. 27-11, at 37–40 [hereinafter Letter of Dec. 26, 2008].

[28] *Id.* ¶ 24; Letter of Dec. 26, 2008 at 3, Doc. 27-11, at 39.

8

dysfunction, and there is no information in the report that would support functional

limitations other than her pain, which I cannot quantify."[29]

Dr. Karen McArthur, board certified in family medicine, provided a second

independent review.[30] She reviewed Holmes's records and spoke to Dr. Curry, Holmes's

family physician, then submitted a report to MetLife on January 19, 2009.[31] Her report

concluded that Holmes has "chronic low back pain [with] periods of intermittent

exacerbation," but was "capable of sitting for 6–8 hours per day with frequent position

changes alternating with standing and walking for 1–2 hours per day."[32] Dr. McArthur

"did not find any evidence that supported [Holmes's claim] that her pain was to the level

of severity that she could not perform [in] the physical capacity as described."[33]

MetLife circulated Dr. McArthur's report to Dr. Krzeminski and Dr. Curry for review

and comment, but the doctors did not reply.[34]

---

[29] *Ids.*

[30] Def.'s Stmt. of Undisputed Facts ¶ 25, Doc. 28.

[31] *Id.* ¶¶ 25–26; Karen McArthur, M.D., Physician Consultant Review (Jan. 19, 2009), Doc. 27-11, at 11–21 [hereinafter Review of Jan. 19, 2009].

[32] Def.'s Stmt. of Undisputed Facts ¶ 27, Doc. 28; Review of Jan. 19, 2009 at 9, Doc. 27-11, at 19.

[33] *Ids.*

[34] Def.'s Stmt. of Undisputed Facts ¶ 28–29, Doc. 28; Letter from Nichole Racine, Clinical Specialist, Metropolitan Life Ins. Co., to Dr. Krzeminski (Feb. 2, 2009), Doc. 27-11, at 33; Letter from Nichole Racine, Clinical Specialist, Metropolitan Life Ins. Co., to Dr. Curry (Feb. 2, 2009), Doc. 27-11, at 34.

9

By letter dated February 10, 2009, MetLife informed Holmes that it was denying her

claim for LTD benefits because "the medical information received [did] not support a

disabling condition" that would prevent her from working.[35] MetLife's letter

acknowledged Dr. Krzeminski's opinion that Holmes could not work and needed bed

rest,[36] but did not consider his opinion determinative. The letter noted that Dr. Curry did

not advise Holmes against returning to work and that Drs. Lancelotta and McArthur both

opined that Holmes was capable of working.[37] MetLife concluded that despite her back

pain, Holmes was able to perform her work-related duties because her job was primarily

sedentary, she could change positions, and she could both walk and avoid constant

prolonged sitting.[38] Included in the letter was notice that Holmes had 180 days to appeal

the denial of her claim.[39]

---

[35] Def.'s Stmt. of Undisputed Facts ¶ 30, Doc. 28; Letter from Mary Ann Zakris, Case Management Specialist, Metropolitan Life Ins. Co., to Jamie [sic] Holmes (Feb. 10, 2009), Doc. 27-11, at 8 [hereinafter Letter of Feb. 10, 2009].

[36] Letter of Feb. 10, 2009 at 1–2, Doc. 27-11, at 8–9.

[37] *Id.*

[38] Def.'s Stmt. of Undisputed Facts ¶ 31, Doc. 28; Letter of Feb. 10, 2009 at 2, Doc. 27-11, at 9.

[39] Def.'s Stmt. of Undisputed Facts ¶ 32, Doc. 28; Letter of Feb. 10, 2009 at 2, Doc. 27-11, at 9.

10

In May 2009, Holmes's attorney requested from MetLife all information that it used in the decision to deny Holmes's claim.[40] MetLife complied later that month.[41] By early August 2009, Holmes had completed submission of an appeal and supporting documentation to MetLife.[42]

As it did for the initial eligibility determination, MetLife sent Holmes's file to an independent physician consultant.[43] This physician was Dr. Jamie Lee Lewis, board certified in pain medicine, and in physical medicine and rehabilitation.[44] He reviewed Holmes's file and twice tried to get in touch with all three of Holmes's treating doctors, but none ever responded.[45] Despite one of Dr. Curry's staffer's reporting to Dr. Lewis that Dr. Curry would be out of the office until August 24,[46] Dr. Lewis issued his report on August 21, 2009, never having actually spoken to any of Holmes's treating doctors. Dr. Lewis's report stated that Holmes's medical record revealed "no standing neurological

---

[40] Def.'s Stmt. of Undisputed Facts ¶ 33, Doc. 28; Letter from Bernadette M. Hohenadel, Nikolaus & Hohenadel, LLP, to Mary Ann Zakris, Case Management Specialist, Metropolitan Life Ins. Co. (May 5, 2009), Doc. 27-11, at 7.

[41] Def.'s Stmt. of Undisputed Facts ¶ 34, Doc. 28.

[42] Id. ¶ 36.

[43] Id. ¶ 37.

[44] Id.

[45] Id. ¶ 38; Facsimile transmission from Jamie Lee Lewis, M.D., to Michele McCann, Metropolitan Life Ins. Co. (Aug. 24, 2009, 4:06 PM), Doc. 27-5, at 5–9 [hereinafter Fax of Aug. 24, 2009].

[46] Fax of Aug. 24, 2009 at 2, Doc. 27-5, at 5.

11

deficits" and "no documentation that would place [Holmes] at an increased risk to harm

or injury or [render her] musculoskeletally incapable of performing her job duties."[47] He

concluded that Holmes could "perform work lifting less than 35 pounds occasionally

[and] occasionally bend, stoop, [and] twist, with no limitations on standing and

walking."[48]

On August 27, 2009, MetLife faxed Dr. Lewis's report to Drs. Curry, Krzeminski, and

Wren for review and comment, requesting that they do so by September 3, but they did

not respond.[49] Plaintiff's attorney objected that the turnaround time was exceedingly short

and unfair, but did not seek an extension.[50]

MetLife notified Holmes on September 22, 2009, that it was upholding its decision to

deny her claim for LTD benefits.[51] Dr. Krzeminski contacted MetLife in October to say

that Holmes could not perform even sedentary employment because of her need for

---

[47] Def.'s Stmt. of Undisputed Facts ¶ 39, Doc. 28; Fax of Aug. 24, 2009 at 4–5, Doc. 27-5, at 7–8.

[48] Def.'s Stmt. of Undisputed Facts ¶ 40, Doc. 28; Fax of Aug. 24, 2009 at 5, Doc. 27-5, at 8.

[49] Def.'s Stmt. of Undisputed Facts ¶¶ 41, 42, Doc. 28.

[50] *Id.* ¶¶ 43–46.

[51] *Id.* ¶ 47; Letter from Stephanie L. Burns, Procedure Analyst, MetLife Disability, to Bernadette M. Hohenadel, Esq., Nikolaus & Hohenadel, LLP (Sept. 22, 2009), Doc. 27-4, at 21 [hereinafter Letter of Sept. 22, 2009].

recumbency and frequent changes in position.[52] MetLife replied that it had completed its

review and would consider no further appeals.[53]

## II. Standard of review[54]

The Denial of benefits in an ERISA case "is to be reviewed under a *de novo* standard

unless the benefit plan gives the administrator or fiduciary discretionary authority to

determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire &*

*Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Title 29 U.S.C. § 1132(a)(1)(B). If the

administrator or fiduciary does have discretionary authority, a district court's review is

limited to determining whether the denial was arbitrary and capricious. *See Miller v. Am.*

*Airlines, Inc.*, 632 F.3d 837, 845 (3d Cir. 2011) (quoting *Abnathya v. Hoffman–La Roche,*

*Inc.*, 2 F.3d 40, 45 (3d Cir. 1993), abrogated on other grounds as recognized by *Miller*);

*Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 387 (3d Cir. 2000), overruled on

other grounds by *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008).

---

[52] Def.'s Stmt. of Undisputed Facts ¶ 48, Doc. 28.

[53] *Id.* ¶ 49.

[54] Plaintiff did not file a brief opposing defendant's motion for summary, but rather filed a cross motion for summary judgment. Under Local Rule 7.6, this failure to file an opposing brief would generally require that defendant's motion be deemed unopposed. However, it is clear in reading plaintiff's motion for summary judgment that she opposes defendant's similar motion. *See also Anchorage Assocs. v. V.I. Bd. of Tax Review*, 922 F.2d 168, 175 (3d Cir. 1990)("a district court cannot provide by local rule that a motion for summary judgment will be automatically granted when the opposing party fails to respond."(quoting *Jaroma v. Massey*, 873 F.2d 17, 20 (1st Cir. 1989)).

A denial is arbitrary and capricious if it is "without reason, unsupported by substantial evidence[,] or erroneous as a matter of law." *Miller*, 632 F.3d at 845 (quoting *Abnathya*, 2 F.3d at 45). Substantial evidence is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence." *Bryan v. Comm'r of Soc. Sec.*, 383 F. A'ppx 140, 145 (quoting *Ginsburg v. Richardson*, 436 F.2d 1146, 1148 (3d Cir. 1971)). A court might disagree with the administrator's decision, but "may not substitute its own judgment for that of plan administrators." *Stratton v. E.I. DuPont De Nemours & Co.*, 363 F.3d 250, 256 (3d Cir. 2004).

Since there is no dispute in this case that the benefit plan grants defendant discretionary authority in construing the plan and making benefits determinations, the denial of benefits may be overturned only if it was arbitrary and capricious.

Under Federal Rule of Civil Procedure 56(a), a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). Typically, when determining whether there is a genuine dispute of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988). However, where a decision to grant or deny benefits under an ERISA-governed plan "is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the

legal question before the district court and the usual tests of summary judgment, such as

whether a genuine dispute of material fact exists, do not apply." *Davis v. Broadspire*

*Servs., Inc.*, No. 05-5829, 2006 WL 3486464, *1 (E.D. Pa. Dec. 1, 2006) (quoting

*Bendixen v. Std. Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999)). *Accord Veryzer v. Am. Int'l*

*Life Assurance Co.*, 765 F. Supp. 2d 422, 431 (S.D.N.Y. 2011); *Epolito v. Prudential Ins.*

*Co.*, 737 F. Supp. 2d 1364, 1369–70 (M.D. Fla. 2010). In effect, the district court sits "as

an appellate court to determine whether the denial of ERISA benefits was arbitrary and

capricious." *Veryzer*, 765 F. Supp. 2d at 431 (quoting *Mohamed v. Sanofi-Aventis*

*Pharm.*, No. 06-1504, 2009 WL 4975260, at *9 (S.D.N.Y. Dec. 22, 2009)).

## III. Discussion

### (A) Evidence that may be considered

Generally, a district court reviews solely "the record made before the plan

administrator" when considering a § 1132(a)(1)(B) ERISA claim. *Howley v. Mellon Fin.*

*Corp.*, 625 F.3d 788, 793–94 (3d Cir. 2010) (quoting *Kosiba v. Merck & Co.*, 384 F.3d

58, 67 n.5 (3d Cir. 2004)). The only evidence outside the administrative record that a

district court may entertain is evidence regarding the "nature, extent, and effect" of

"potential biases and conflicts of interest." *Id.* (quoting *Kosiba*, 384 F.3d at 67 n.5, and

*Burke v. Pitney Bows Inc. Long-Term Disability Plan*, 544 F.3d 1016, 1028 (9th Cir.

2008)).

### (B) Factors affecting the abuse-of-discretion analysis

15

**(1) MetLife's conflict of interest**

Under the benefit plan, MetLife is both insurer and administrator of claims. This dual role creates a conflict of interest because MetLife's "fiduciary interest may counsel in favor of granting a borderline claim while its immediate financial interest counsels to the contrary." *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008). Such a conflict of interest "must be weighed as a factor in determining whether there is an abuse of discretion." *Id.* at 111 (quoting *Firestone*, 489 U.S. at 115) (internal quotation marks omitted). The import of the conflict varies depending on the context:

> [It] should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

*Id.* (internal citations omitted) (citing, *e.g.*, John H. Langbein, *Trust Law as Regulatory Law: The Unum/Provident Scandal and Judicial Review of Benefit Denials Under ERISA*, 101 Nw. U. L. Rev. 1315, 1317–21 (2007); Leo Herzel & Dale E. Colling, *The Chinese Wall and Conflict of Interest in Banks*, 34 Bus. Law. 73, 114 (1978)).

16

Defendant has established that it engaged three "independent physician consultants"[55] to review plaintiff's complete file—two during the initial claim-review process and one on appeal—but this measure does not ameliorate the conflict of interest. These physicians were apparently hired on a contractual basis, and their likely desire to be rehired in the future would have created an incentive to issue reports consistent with MetLife's financial interests. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003) (noting that "physicians repeatedly retained by benefits plans may have an incentive to make a finding of 'not disabled'" (internal quotation marks omitted)). As consultants, they could only influence benefits decisions, not determine them; MetLife's contracting with outside physicians is not equivalent to "walling off claims administrators from those interested in firm finances." *Glenn*, 554 U.S. at 111.

MetLife's claim-review procedures contrast strongly with other procedures found to have safeguards against biased outcomes, such as those under consideration in *Russell v. Alcoa, Inc.*, No. 06-1459, 2008 WL 906448 (M.D. Pa. Mar. 31, 2008) (Vanaskie, J.). In that case, Alcoa was, like MetLife here, both the insurer and the plan administrator. *Id.* at *8. Alcoa mitigated its structural conflict by implementing several procedural protections. Claims were first subject to "independent initial review." *Id.* The first appeal went to a third-party claims administrator that received a service-based fee regardless of the outcome. *Id.* The second appeal went to a five-member panel of plan participants—

---

[55] Def.'s Stmt. of Undisputed Facts ¶¶ 22, 25, 37, Doc. 28.

"fellow workers" that made "final, binding determinations" of benefit eligibility. *Id.* These measures, designed to ensure procedural fairness, counterbalanced Alcoa's structural conflict. *Id.*

Since the present record suggests neither that MetLife employs procedural safeguards like those described in *Russell* nor that it is particularly prone to biased claims administration, there is no basis for according MetLife's conflict particularly slight or heavy emphasis. The conflict should be given "weight to some degree," but not be determinative by itself. *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 118 (2008).

### (2) Other factors

The *Glenn* Court explicitly declined to provide a "detailed set of instructions" for deciding whether to defer to an insurer–administrator's denial of benefits. *Id.* at 119. Rather, the scope of the inquiry was left open-ended, and a district court may "take account of several different considerations." *Id.* at 117. The relevant factors in *Glenn* were:

> (1) the conflict of interest; (2) MetLife's failure to reconcile its own conclusion that Glenn could work in other jobs with the Social Security Administration's conclusion that she could not; (3) MetLife's focus upon one treating physician report suggestion that Glenn could work in other jobs at the expense of other, more detailed treating physician reports indicating that she could not; (4) MetLife's failure to provide all of the treating physician reports to its own hired experts; and (5) MetLife's failure to take account of evidence indicating that stress aggravated Glenn's condition.

*Id.* at 110 (citing *Glenn v. MetLife*, 461 F.3d 660, 674 (6th Cir. 2006), aff'd, *Glenn*, 554

U.S. at 105). Other factors that the Third Circuit has considered in ERISA cases include a

doctor's statement that the plan participant was incapable of performing sedentary work,

*Serbanic v. Harlesville Life Ins. Co.*, 325 F. App'x. 86, 90 (3d Cir. 2009);  the insurer

ignoring such a statement while relying on doctors who stated that the plan participant

was not disabled, *id.*; and "self-serving selectivity in the use and interpretation of

physicians' reports," *Hession v. Prudential Ins. Co.*, 307 F. App'x 650, 653 (3d Cir.

2008) (quoting *Post v. Hartford Ins. Co.*, 501 F.3d 154, 164–65 (3d Cir. 2007), overruled

by implication on other grounds by *Glenn*, 554 U.S. at 105).

Plaintiff urges consideration of two factors that weigh against upholding MetLife's

denial of benefits. First, she contends, the initial denial is directly contradictory to Dr.

Curry's records and testimony. Second, both the initial denial and the denial on appeal

relied only on MetLife's consultants. Each will be addressed in turn.

### (a) Contradiction between Dr. Curry's records and the basis for denial

According to the letter denying plaintiff's application for LTD benefits, Dr. Curry

completed a statement on October 14, 2008, describing plaintiff as able to sit, stand, and

walk for one hour a day and lift up to fifty pounds occasionally.[56] Still relating the

statement's contents, the denial letter reported that Dr. Curry did not advise plaintiff to

stop working and that plaintiff's physical restrictions were consistent with her job

---

[56] Letter of Feb. 10, 2009, at 1, Doc. 27-11, at 8.

duties.[57] The letter concluded that the "medical information on file does not support a severity of pain that would prevent [her] from working" and that she could perform her "own job duties."[58]

A review of Dr. Curry's October 14, 2008, statement reveals the spin that defendant put on Dr. Curry's report. On the statement, next to the question "Did you advise the patient to cease [her] occupation?" Dr. Curry checked the box labeled "No." But beneath that question, he wrote: "Done by previous provider." Notably, in response to the question "Have you advised patient to return to work?" Dr. Curry checked "No."[59] He further explained: "Patient has failed attempts at more sedentary work."[60] This advice against returning to work is in direct contradiction to the suggestion in the denial letter that Holmes could continue working.[61] And, in contrast to the denial letter, Dr. Curry did not simply say that plaintiff could lift up to fifty pounds occasionally. Instead, the statement contained a table filled out as follows:[62]

(c) Patient's ability to lift/carry: (check)

---

[57] *Id.*

[58] *Id.* August 11, 2011

[59] William J. Curry, M.D., Attending Physician Statement (Oct. 14, 2008), Doc. 27-13, at 15.

[60] *Id.*

[61] Letter of Feb. 10, 2009, at 1, Doc. 27-11, at 8.

[62] *Id.*

|  | Never 0% | Occasionally 1–35% | Frequently 36–66% | Continuously 67–100% |
|---|---|---|---|---|
| Up to 10 lbs. | | | X | |
| 11 to 20 lbs. | | | X | |
| 21 to 50 lbs. | | X | | |
| 51 to 100 lbs. | X | | | |
| Over 100 lbs. | X | | | |

Thus, what Dr. Curry actually reported on this form is that plaintiff could lift somewhere between 21 and 50 pounds, somewhere between 1% and 35% of the time.

Moreover, MetLife's letter of denial outright ignored the entirety of a 2008 deposition of Dr. Curry, which MetLife had a copy of as of the time of the initial benefits denial. In that deposition, Dr. Curry reported repeated, frequent, rarely improving, and often worsening, reports of pain, with occasional debilitating flare-ups. He told of the time her back pain began, when she was moving a patient in the Emergency Department, in May 2003.[63] He told of her failed physical therapy, the conservative treatments that did not work, and first one and then another lumbar fusion for a herniated disc, neither of which seemed to "give her benefit."[64] Meanwhile, Holmes carried a baby to term and had "done reasonably well" during her nine months.[65] She had returned to work, but experienced a "flare in her back discomfort," complaining of increased lower back pain in a visit to Dr.

---

[63] Curry Dep. 6:16–21, Mar. 19, 2008, Doc. 27-9, at 4.

[64] *Id.* at 6:24–7:19, Doc. 27-9, at 4–5.

[65] *Id.* at 8:8–15, Doc. 27-9, at 6.

21

Curry's office on July 27, 2007.[66] During that visit, Holmes reported pain and numbness

that radiated down her right leg; Dr. Curry nioted that "many, many times" when he had

seen her before, she would complain about "discomfort going all the way down to the

foot.[67]He

    Dr. Curry next saw Holmes on August 13, 2007, noting that "[i]t doesn't look like she

had any improvement" and observing that ever since she went back to work, she was

"having more discomfort in her lower back and described it as radiating into the right

lower extremity."[68] He asked her to take a 48-hour break from work, then return to four-

hour days with restrictions on bending, stooping, and repetitively getting up and down

from a chair.[69] A visit a month later, on September 10, revealed slight improvement, and

Dr. Curry recommended trying to increase her work schedule to six hours a day for three

weeks, and if that worked, then to go to eight hours a day, meanwhile keeping the same

restrictions on her activity and movement.[70]

---

[66] *Id.* at 8:16–22.

[67] *Id.* at 9:1–7. Doc. 27-9, at 7.

[68] *Id.* at 10:13-23, Doc. 27-9, at 8.

[69] *Id.* at 11:6–10, Doc. 27-9, at 9.

[70] *Id.* at 12:2–22, Doc. 27-9, at 10. Holmes had also noted that lying down for a few
minutes at a time could give her some relief from pain.

22

Less than two weeks later, her "back pain was much worse."[71] Over the weekend

before she called on Monday, September 25, she was "having a lot of spasms" and "a lot

of pain," and obtained a visit with a nurse practicitioner that day.[72] By October 17, "she

was still having quite a flare up," and insisted that she had no falls, trauma, or missteps

that would have aggravated her condition.[73] Dr. Curry opined that Holmes may not have

"had a good healing" from her previous back surgery, although an MRI noted no

misalignment.[74] He asked her to take off work for the rest of the week, then return the

following, with the same restrictions just discussed.[75]

But she did not return to work; she was offered no four-hour or other alternative

positions.[76] Visits on December 10, 2007[77], February 4, 2008,[78] and on March 19, 2008[79]

revealed little or no change in her condition, and in March 2008, "another flare of low

---

[71] *Id.* at 13:9, Doc. 27-9, at 11.

[72] *Id.* at 13:1–15.

[73] *Id.* at 13:22–14:16, Doc. 27-9, at 11–12.

[74] *Id.* at 14:3–6, Doc. 27-9, at 12.

[75] *Id.* at 18:15–20, Doc. 27-9, at 16.

[76] *Id.* 16:21–22.

[77] *Id.* 18:25–19:3, Doc. 27-9, at 16–17.

[78] *Id.* 20:14–17, Doc. 27-9, at 20.

[79] *Id.* 21:12–22:1, Doc. 27-9, at 19–20.

back pain" was causing her "difficulty . . . tending to her infant son's needs" and pick him up and carry him around.[80] Dr. Curry's prognosis for her was "[g]uarded at best."[81]

Either way the data are construed, reconciling the discrepancies between the denial letter and Dr. Curry's statement requires a liberal interpretation of what Dr. Curry reported. Holmes cannot work full-time if she can stand, sit, and walk for only an hour each per day Dr. Curry said he did not advise plaintiff not to return to work because another provider had already made this recommendation. Under these circumstances, the doctor's decision not to give redundant advice cannot become grounds for concluding that plaintiff is able to work.

The initial decision of denial and Dr. Curry's letter are, at least, inconsistent. This factor weighs in plaintiff's favor.

### (b) Disregard of Dr. Krzeminski's opinion

Dr. Krzeminski gave a deposition as an expert witness on July 16, 2008.[82] He had begun treating Holmes sometime in 2004 in response to her complaints of "continuing low back pain."[83] He described a first fusion operation at L5-S1 that had not fully healed; this led to a second L5-S1 operation that provided some relief, but Holmes's condition

---

[80] *Id.* 21:21–22:1, Doc. 27-9, at 19–20.

[81] *Id.* 23:19–20, Doc. 27-9, at 23.

[82] Krzeminski Dep., July 16, 2008, Doc. 30-1, at 8, 8–28.

[83] *Id.* 4:22–23, Doc. 30-1, at 11.

began worsening by October 22, 2007.[84] Over months of follow-up care, time taken off

work, and continuing and worsenening back pain, Dr. Krezeminski concluded that there

was no way she would be able to return to work without "substantial restrictions," judging

her prognosis as "fair to poor for a major improvement in her situation."[85]

    Based on an October 11, 2007, x-ray of Holmes's spine that Dr. Krzeminski

evaluated, he observed "increased angulation of the spine at the dis space at L4-5 that was

not within the range of normal limits," meaning, essentially, "objective findings for why a

patient would be having worsening back pain, especially with standing, sitting,

walking."[86] When he saw her again in late November 2007 he observed "increasing back

pain" and "worsening discomfort[,] as would be expected" from her increased activity

levels.[87] Dr. Krzeminski continued to see her regularly, putting her on chronic pain

management and  continuing to keep her off work as of January 2, 2008.[88] He testified

that it was medically reasonable to take her off of her largely sedentary work position in

October 2007 because even though her job required "relatively sedentary activity," "any

upright or erect activity on her part poses problems" with the type of lower-back mobility

---

[84] *Id.* 5:1–10, Doc. 30-1, at 12.

[85] *Id.* 5:20–6:4, Doc. 30-1, at 12–13.

[86] *Id.* 7:9–8:1, Doc. 30-1, at 7–8.

[87] *Id.* 8:9–13, Doc. 30-1, at 15.

[88] *Id.* 8:16–9–11, Doc. 30-1, at 15–16.

problems that Holmes had.[89] Although Holmes retained some ability to perform sedentary

activity, she would need the opportunity for bed rest.[90]

### (c) MetLife's reliance solely on its consultants

MetLife's letter of denial refers to the opinions of four doctors: Drs. Curry and Dr.

Krzeminski, plaintiff's doctors; and Drs. Lancelotta and McArthur, the consultants that

MetLife used. To summarize their opinions as stated in the letter:[91]

- Plaintiff can sit, stand, and walk one hour a day and occasionally lift up to 50 pounds. (Dr. Curry)

- Plaintiff cannot work, must frequently change position, and needs bed rest. (Dr. Krzeminski)

- Plaintiff has no neurological issues to cause physical impairment; no comment on functionality. (Dr. Lancelotta)

- Plaintiff can sit "for 6–8 hours per day with frequent position changes alternating with standing and walking for 1–2 hours per day" and lift "less than 20 pounds" on occasion. (Dr. McArthur)

Of these four opinions, the only one that seems plausibly to support MetLife's denial of

benefits is Dr. McArthur's. Dr. Lancelotta declined to comment on plaintiff's ability to

---

[89] *Id.* 10:24–11:12, Doc. 30-1, at 17–18.

[90] *Id.* 15:8–18, Doc. 30-1, at 22.

[91] Letter of Feb. 10, 2009, at 2, Doc. 27-11, at 9.

work, Dr. Krzeminksi unequivocally stated that plaintiff was disabled, and Dr. Curry's

form indicated that Holmes had tried, while under his care, to return to work at a more

sedentary position; but when that attempt failed, he did not advise her to return to work..

   The denial letter is too cursory in its reasoning for anyone but its author to know

whether Dr. McArthur's opinion was in fact the only one relied upon, but at the least, his

opinion was given determinative weight without any explanation for relying on it so

heavily. The letter included no discussion of the years' worth of diagnostic notes taken by

Drs. Curry and Krzeminski. Although plan administrators have no "discrete burden of

explanation when they credit reliable evidence that conflicts with a treating physician's

evaluation," neither may they "arbitrarily refuse to credit a claimant's reliable evidence."

*Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). Despite paying lip

service to the opinions of plaintiff's treating doctors, MetLife's letter breezed past a

summary of their opinions, outlined its own consultants' opinions, and concluded with

scant analysis that plaintiff was capable of working full-time.[92] An insurer's unreasoned

preference for its own consultants' opinions undermines the legitimacy of its eligibility

---

[92] The Court also observes that MetLife's letter of denial is riddled with grammatical errors that not only suggest a lack of carefulness in considering plaintiff's case but also threaten to obscure MetLife's meaning. For example: "Considering that your job is sedentary with ability to change positions while going to get patients and escorting them to your work station gives you the opportunity stand, and walk as well as avoid constant prolonged sitting therefore concluding that you can perform your own job duties." Letter of Feb. 10, 2009, at 2, Doc. 27-11, at 9. Such syntactical disasters make interpreting MetLife's letter more difficult than it needs to be.

determination. *See Klaassen v. Allstate Cafeteria Plan*, 637 F. Supp. 2d 272, 281–82

(M.D. Pa. 2007) (finding an insurer's denial of benefits to be arbitrary and capricious

when the insurer made "no attempt to reconcile (or even to discount)" a treating doctor's

opinion that the plan participant was disabled); *Morgan v. Prudential Ins. Co.*, 755 F.

Supp. 2d 639, 646 (E.D. Pa. 2010) (citing *Kosiba v. Merck & Co.*, 384 F.3d 58, 67–68 (3d

Cir. 2004)) (observing that a "procedural anomaly arises" if, "without a sufficient basis,"

an insurer gives "substantially more weight" to consultants' opinions than to the

conclusions of treating physicians); *Elms v. Prudential Ins. Co.*, No. 06-5127, 2008 WL

4444269, at *15 (E.D. Pa. Oct. 2, 2008) (calling it "unacceptable" when an insurer

"completely ignored" a treating doctor's diagnosis indicating disability).

    The basis for MetLife's denial of plaintiff's appeal, as related in MetLife's letter of

September 22, 2009, is also questionable. Before making the decision to deny the appeal,

MetLife forwarded plaintiff's entire file to a consultant unidentified in the letter, said only

to be a physician who was board-certified in pain management and in physical medicine

and rehabilitation.[93] The only medical opinions to which the denial of appeal refers are

those of this unidentified consultant.[94] Files from Drs. Curry, Krzeminski, and Wren

---

[93] Letter of Sept. 22, 2009, at 2, Doc. 27-4, at 22. In submissions on its motion for
summary judgment, defendant identified the consultant as Dr. Jamie Lee Lewis.

[94] *Id.*

receive brief mention but no discussion.[95] Even though MetLife's consultant did not

examine plaintiff and relied on data from plaintiff's treating doctors — the same data that

led Drs. Curry and Krzeminski to conclude that plaintiff's ability to work was

substantially restricted — the denial of appeal made no criticism of the treating doctors'

conclusions or reasoning. As with the initial letter of denial, the denial of appeal exhibits

an unexplained, self-serving selectivity concerning which doctors' reports to rely on, a

characteristic that evinces a lack of reason or substantial evidence for  MetLife's

conclusions.

### (C) Whether MetLife abused its discretion in denying benefits to plaintiff

A combination of several circumstances militate against upholding MetLife's denial

of benefits: its conflict of interest; its sole or primary reliance on its consultants' medical

opinions; the inconsistency between Dr. Curry's records and the stated basis for the initial

denial of eligibility. The decision on appeal discusses only the conclusions of MetLife's

consultant and ignores the reasoning and data of Holmes's treating doctors. Evidence of

the years of doctors' visits, treatments, and attempted therapies show that Holmes's

condition steadily worsened until she almost completely lost the ability to perform even

sedentary work without debilitating pain. Yet MetLife twice found that Holmes was not

disabled and was capable of performing work full-time. Taken together, these factors

show that MetLife acted unreasonably in denying LTD benefits to plaintiff, basings its

---

[95] *Id.*

decision on not even a scintilla of evidence.[96] Plaintiff has met her burden of showing that MetLife's denials were "without reason, unsupported by substantial evidence[,] or erroneous as a matter of law." *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 845 (3d Cir. 2011) (quoting *Abnathya v. Hoffman–La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993), abrogated on other grounds as recognized by *Miller*).

Reviewing the records as the whole, there is no substantial evidence to support MetLife's denial of disability benefits to Holmes. Several doctors who treated Holmes for years came to the conclusion that she was incapable of working full-time; yet MetLife, ungrounded from reason in this instance, concluded otherwise. Since MetLife's decision is not entitled to deference, reversal is appropriate.

### (D) Limitation of any benefits entitlement to a twenty-four-month period

MetLife argues that even if plaintiff is entitled to LTD benefits, she would be eligible to receive benefits for only twenty-four months. Under the benefits plan, disability because of a musculoskeletal injury entitles a plan participant to only twenty-four months of benefit payments unless the injury is one of certain specified kinds, like radiculopathies, myelopathies, or myopathies. Since plaintiff suffers from a musculoskeletal injury that is not one of the specified kinds, the argument goes, her LTD

---

[96] Indeed, in an October 2009 entry, made after MetLife reviewed a statement from Dr. Krzeminski, MetLife's own Claim Activity Log for Holmes's case reported that Holmes "has the inability to perform even sedentary employment and . . . requires frequent changes in position including recumbency due to pain." Doc. 27-4, at 11 (Bates No. 107).

30

benefits would expire after twenty-four months. Allowing for the plan's 180-day

elimination period,[97] the time span for plaintiff's receipt of benefits would be April 13,

2008, to April 12, 2010.

However, evidence in the administrative record shows that plaintiff has indeed been

diagnosed with a myelopathy. The report from Dr. Lewis, one of MetLife's consultants,

indicates a diagnosis that includes "lumbar disc disorder with/myelopathy [sic]."[98]

Symptoms reported in one of Dr. Wren's outpatient notes are also consistent with a

radiculopathy; he notes that plaintiff was suffering from "intermittent pain down the right

leg," going down to her foot at times.[99] Given the diagnosis and symptoms that numerous

doctors described, it is hardly clear that plaintiff's benefits would be limited to twenty-

four months. Summary judgment for defendant is not appropriate on this point.

Under the Plan, "benefits will begin to accrue on the day after the day You complete

Your Elimination Period."[100] The "Elimination Period," the time following a worker's

injury during which MetLife does not pay benefits, is 180 days.[101] Thus, since Holmes's

---

[97] Benefit Plan at 33, 21, 18, Doc. 27-2, at 39, 27, 24.

[98] Fax of Aug. 24, 2009 at 2, Doc. 27-5, at 5.

[99] Andrew J. Wren, Outpatient Note 1 (June 11, 2009), Doc. 30-1, at 39.

[100] Benefit Plan at 33, Doc. 27-2, at 39.

[101] *Id.* at 18, Doc. 27-2, at 24.

last day worked was October 15, 2007, her elimination period from October 16, 2007,

until April 12, 2008, with a benefit effective date of April 13, 2008.

## IV. Conclusion

Based on the foregoing, it is recommended that this Court DENY defendant's motion

for summary judgment and GRANT plaintiff's motion for summary judgment, reversing

MetLife's denial of benefits and entitling Holmes to long-term disability benefits

backdated to an effective date of April 13, 2008.

Signed on August 12, 2011.

_____

MILDRED E. METHVIN
UNITED STATES MAGISTRATE JUDGE